IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 6, 2025 Session

## COMMITTEE TO STOP AN UNFAIR TAX ET AL. v. FREDDIE O'CONNELL ET AL.

**Appeal from the Chancery Court for Davidson County**
No. 24-1427-II     Anne C. Martin, Chancellor

_____

### No. M2025-00072-COA-R3-CV

_____

The plaintiffs brought an election contest and a declaratory judgment action against the defendants to enjoin the implementation of Metro Ordinance No. BL2024-427, which implements Metro's transit improvement plan created pursuant to the Improving Manufacturing, Public Roads and Opportunities for a Vibrant Economy Act. The trial court found that the plan and ballot question complied with the Act in all respects. We affirm, except that we find that the surcharge in the transit improvement plan cannot be used for the acquisition of land for housing and parks.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed in Part and Reversed in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Kirk L. Clements, Nashville, Tennessee, for the appellants, Committee to Stop an Unfair Tax and Emily Evans.

Lora Barkenbus Fox, J. Brooks Fox, Benjamin A. Puckett, Robert E. Cooper, Jr., Wallace W. Dietz, and Jeffrey P. Yarbro, Nashville, Tennessee, for the appellees, Mayor of Metropolitan Government of Nashville and Davidson County, Metropolitan Government of Nashville and Davidson County, and Davidson County Election Commission.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

In 2017, the Tennessee General Assembly enacted the Improving Manufacturing, Public Roads and Opportunities for a Vibrant Economy Act (the "IMPROVE Act"), 2017

TENN. PUB. ACTS, ch. 181. Among other things, the IMPROVE Act allowed local governments to increase certain taxes to fund investment in a transit improvement program ("TIP"). A TIP is defined as "a program consisting of specified public transit system projects and services." Tenn. Code Ann. § 67-4-3201(5). In turn, the IMPROVE Act defined "public transit system" as:

> any mass transit system intended for shared passenger transport services to the general public, together with any building, structure, appurtenance, utility, transport support facility, transport vehicles, service vehicles, parking facility, or any other facility, structure, vehicle, or property needed to operate the transportation facility or provide connectivity for the transportation facility to any other non-mass transit system transportation infrastructure, including, but not limited to, interstates, highways, roads, streets, alleys, and sidewalks[.]

Tenn. Code Ann. § 67-4-3201(3).

In 2024, the mayor's office began working on a transit plan to submit to the voters pursuant to the Improve Act. Beginning in February 2024, until the eve of the referendum, there were many meetings, events, council member listening sessions, and advisory committee meetings seeking public comment. Metro also provided a website concerning the proposed plan. On March 1, 2024, the Tennessee Comptroller of the Treasury approved the Metro Finance Director's selection of Kraft CPAs PLLC to review the financial feasibility of the proposed TIP. On April 24, 2024, the Comptroller approved the procedures to be used by Kraft in analyzing the TIP. Kraft issued its report on May 13, 2024, stating that:

> In our opinion, management's assertions related to the Plan of Finance about the methodology and assumptions used in the financial forecasts and projections supporting its analysis that the proposed transit program is financially feasible, and assertions about the amount of the transit improvement program's infrastructure to be financed through bonds, sales tax surcharges, and other financing methods, provide a reasonable basis for Metro Nashville's Plan of Finance and are presented in accordance with criteria set forth in Sections 67-4-3201 through 67-4-3206, Tennessee Code Annotated, in all material respects.

The TIP plan breaks down into six categories, which the trial court described as follows:

> 1. Sidewalks, Signals, Streets and Safety (pgs. 23-38): "The TIP's Investment in doing the basics brilliantly — delivering safe and efficient streets and sidewalks — are the enabling infrastructure for transit

improvements throughout the region and also facilitate safe walking access to transit while promoting efficient traffic management." (Pg. 23). [Witness Michael] Briggs testified that the proposed network of new sidewalks and traffic light coordination and road improvements are along the public transit corridors, with reference to the maps included in this section of the Plan. (Pgs. 26, 28, 32 and 37).

2. All-Access Corridors (pgs. 39-44): "We call these All-Access Corridors because upgrades along these routes improve service for everyone, whether you drive, ride, walk or roll. Nashville's most heavily-traveled routes get it all: more frequent transit service, more sidewalks, improved signals, and safer travel conditions for all users. The TIP implements dedicated transit lanes for fast, reliable, convenient service on a majority of Nashville's business corridors. Built with the future in mind, All-Access Corridors serve today's demand and tomorrow's increased ridership, making moving around Nashville more convenient and affordable." (Pg. 39). The maps and charts in this section show the referenced corridors and the length of highway/road improvements included in the Plan. (Pgs. 42-43).

3. WeGo Essentials (pgs. 45-56): "Our transportation infrastructure will be modern, clean, attractive, and perceived as a community benefit. It will be easy and safe to park your car and hop on a bus to see a Titans game. Neighborhoods will have newly built and cleverly design [sic] transit centers and, in some instances, coupled with community parks and high-quality homes that are affordable and attractive. All of this is part of our TIP." (Pg. 45). The section details new transit center adjacent parking spaces, bus stop improvements, new transit centers and bus garages, and more buses.

4. WeGo Service Enhancers (pgs. 57-74): "[W]e are committing significant resources to ramping up the frequency of the transit network. The TIP proposes an 80% increase in overall service hours. . ." (Pg. 57, emphasis in original). The section details new routes and frequency of service, as well as express service to tie in future service expansions to surrounding counties in the future, as well as improvements to the WeGo Star train system.

5. Places for Everyone (pgs. 75-78): "The TIP provides an opportunity to dramatically reduce transportation costs for Nashvillians, which are a large component of cost of living here. The TIP also proposes investments that make intelligent, generational improvements not only in our transportation infrastructure, but in the neighborhoods that receive it." (Pg. 75). This section details the inclusion of investment in land "use[d] to improve the neighborhoods around transit infrastructure" and "developed with a variety

of transit-connected community needs, such as thoughtfully designed affordable housing. . .walkable to transit[.]" (Pgs. 76-77).

6. Innovation & Technology (pgs. 79-83): "We're providing relief to our more rural residents who want and need better transit by expanding WeGo Link, Nashville's microtransit pilot, countywide. Via a few swipes and touches on a phone, residents living in the county's more rural areas, or just out of the way of fixed-service routes, can dial up transit service. WeGo Link helps get all our residents where they want to go, without a car and even without a local bus route." (Pg. 79).

(Quotations are from the TIP plan.) The plan was introduced in the Metro Council as Bill No. BL2024-427 and was enacted on July 19, 2024. The ordinance included the language that appeared on the ballot. On August 1, 2024, the Davidson County Election Commission voted to place the referendum on the November 5, 2024 ballot and the referendum election was held on November 5, 2024. The certified election results were 183,663 for and 96,544 against.

On November 27, 2024, the plaintiffs, Committee to Stop an Unfair Tax and Emily Evans, the Committee's chair, filed this lawsuit against the defendants Mayor Freddie O'Connell and the Davidson County Election Commission, pursuant to the election contest statute, Tenn. Code Ann. §§ 2-17-101-117, and the Declaratory Judgment Act, Tenn. Code Ann. §§ 29-14-101-113. The chancellor tried the matter on January 8, 2025. Michael Briggs, a leader of the mayor's team on the transit plan, testified as to the plan and its development. He was the only person to testify at trial. The chancellor issued her decision on January 13, 2025.

The trial court concluded that the lawsuit was not an election contest – there was "no challenge to the conduct of the election such as allegations of illegal ballots or fraud." While the plaintiffs claimed that the Mayor intentionally misled voters, the court found that such an allegation did not "rise to the level of an election contest as contemplated by the statute." As for the declaratory judgment part of the lawsuit, the court took that portion as "challenging the validity of the Ordinance, and specifically whether the Plan qualifies as a TIP under the IMPROVE Act." The court found the language of the act to be clear and unambiguous and concluded that the legislative intent could be found from the text. The trial court found the Plan to meet the definition of a TIP, stating as follows:

The Court finds, as a matter of law, that the Plan is, in all of its elements, a transit improvement program. It consists of specified public transit system projects and services as required by Tenn. Code Ann. § 67-4-3201(5). Plaintiffs' assertion that the TIP can only be limited to the mass transit system element of the public transit system misses the context of the definition of public transit system in the IMPROVE Act. The definition is broad, including

anything else to operate a transportation facility "*or provide connectivity for the transportation facility to any other non-mass transit system transportation infrastructure.*" Tenn. Code Ann. § 67-4-3201(3) (emphasis added). It "*include[es], but [is] not limited to, interstates, highways, roads, streets, alleys, and sidewalks.*" *Id.* (emphasis added). The IMPROVE Act gives the local government broad discretion in how to use surcharge funds, as long as they are related to the TIP. The Plan elements, as explained at trial by Briggs, involve more than simply mass transit vehicles or facilities, but are all adjacent or appurtenant to those elements, and allow resident access to them. The roads and sidewalks are in the mass transit corridors. The real property to be acquired are adjacent to WeGo facilities and are for those who need to access those facilities, whether it is to live or park or otherwise easily get there because of close proximity.

The trial court also rejected the plaintiffs' challenge to the financial feasibility of the plan: "They provided no proof that it is not financially feasible, or the review by Kraft, or the material that it relied upon in doing its review, was suspect or inaccurate." The ballot language, the trial court found, complied with the requirements of the act, including the costs being listed in current dollars.

The plaintiffs appealed, raising the following issues:

1. Whether the trial court erred in finding that the [sic] Metro's transportation Improvement Plan meets the definition of a Transit Improvement Program as defined under the IMPROVE Act;
2. Whether the trial court erred in finding that the referendum on the ballot met each of the requirements of the IMPROVE Act;
3. Whether the trial court erred in finding that prior to the referendum being placed on the ballot, Metro met all of the statutory requirements under the IMPROVE Act;
4. Whether the trial court erred in finding that the plaintiffs' causes of action were not a proper election contest;
5. Whether the trial court erred in not finding that the election was void;
6. Whether the trial court erred in finding that Defendants did not mislead the voters by including projects in the plan which did not meet the definition of a public transit system project;
7. Whether the trial court erred in finding that the voters were not mislead by Metro as to the legality of the plan;
8. Whether the trial court erred in finding that the voters were not mislead by Metro inserting the "current" cost of the plan in the referendum language;
9. Whether the trial court erred in finding that the plan was financial [sic] feasible;
10. Whether the trial court erred in severely limiting the scope of discovery;

11. Whether the trial court erred in denying Plaintiffs' motion for sanctions.

The defendants presented the issues as follows:

1. Whether Plaintiffs asserted a proper election contest claim.
2. Whether the Trial Court correctly confirmed that the Transit Referendum was lawfully conducted and that the Plan and Ordinance are compliant with the IMPROVE Act.
3. Whether Plaintiffs have standing to challenge the legality of the Plan and Ordinance.
4. Whether the Trial Court correctly exercised its discretion in managing discovery and denying Plaintiffs' motion for discovery sanctions.

We will discuss these issues, rearranged and somewhat restated, below.

STANDARD OF REVIEW

Findings of fact are reviewed "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." TENN. R. APP. P. 13(d). "[W]hen an issue on appeal requires statutory interpretation, we review the trial court's decision de novo with no presumption of correctness." *Nationwide Mut. Fire Ins. Co. v. Memphis Light, Gas & Water*, 578 S.W.3d 26, 30 (Tenn. Ct. App. 2018).

ANALYSIS

I.      Whether this action is an election contest

Defendants' counsel conceded during oral argument that this matter is an election contest.

II.      Whether the plaintiffs presented grounds to invalidate the election

Under the election contest statutes, there are two grounds upon which an election contest may be based: (1) a claim that the election was valid, but that the outcome was not properly determined; and (2) a claim that the election itself was null and void. *Barrett v. Giles Cnty.*, No. M2010-02018-COA-R3-CV, 2011 WL 4600431, at *2 (Tenn. Ct. App. Oct. 5, 2011) (citing *Stuart v. Anderson Cnty. Election Comm'n*, 237 S.W.3d 297, 303 (Tenn. Ct. App. 2007). The plaintiffs seek a determination that the election is void. They base their claims on allegations of fraud. There are no allegations of the casting of fraudulent ballots. Rather, the plaintiffs maintain that "the voters were misled and did not understand the consequence of their vote." As phrased in prior cases, this is "fraud and illegality rendering the election uncertain," *Fraternal Order of Police v. Metro. Gov't of*

*Nashville*, 582 S.W.3d 212, 217 (Tenn. Ct. App. 2019), or fraud so permeating the election "that it cannot be said to fairly reflect the will of the voters." *Forbes v. Bell*, 816 S.W.2d 716, 720 (Tenn. 1991). They alleged three instances of supposed ballot fraud: "burying" the surcharge amount at the end of the ballot, using the current cost of the project instead of the initial cost, and proposing a plan that goes beyond the parameters of the IMPROVE Act.[1] Thus, they have presented grounds, if proven, on which to invalidate the election.

### III.    Whether ballot requirements were met

The ballot requirements for the referendum are found in the IMPROVE Act.

(b) A transit improvement program must indicate and describe in reasonable detail the public transit system projects and services to be funded and implemented under the program.

(c) A transit improvement program must state:
(1) The type and rate of a surcharge that will provide funding to the program;
(2) When a surcharge will terminate or the date or conditions upon which the surcharge will be terminated or reduced;
(3) Any other sources of funding for the program;
(4) An estimate of the initial and recurring cost of the program;
(5) The implementing agencies responsible for carrying out the program; and
(6) The geographic location of the public transit system projects.

. . .

(f) The ordinance or resolution must contain a brief summary of the transit improvement program for which revenue from the surcharge will be used, written in a clear and coherent manner using words with common everyday meanings, and not exceeding two hundred fifty (250) words in length, and must include the information listed in subsections (b) and (c). The brief summary shall be placed on the ballot pursuant to § 67-4-3202(b)(1).

Tenn. Code Ann. § 67-4-3206(b)-(c), (f).

The brief summary, as adopted by the Metro Council and as it appeared on the ballot, states:

Passage of this measure adopted by Ordinance BL2024-427, allows the Metropolitan Government to complete the entire priority sidewalk network

---

[1] Each claim could also be characterized as noncompliance with the IMPROVE Act, rather than the more inflammatory term "fraud."

when combined with annual capital spending, provide significantly expanded 24-hour public transportation service 365 days a year including frequent service on major routes, add more neighborhood transit centers, improve safety for all roadway users, and upgrade and modernize nearly two-thirds of the city's signalized intersections.

This program's capital cost is estimated to have a current cost of $3,096,000,000. Once construction is complete, the estimated value of recurring annual operating and maintenance costs is approximately $111,000,000. The Metropolitan Transit Authority (WeGo), Nashville Department of Transportation and Multimodal Infrastructure, Metro Planning Department, and Mayor's Office, in partnership with other Metro departments, will undertake implementation of the program.

This program will be funded by federal grants, revenues from transportation system fares, debt, and a sales tax surcharge of 0.5%. The tax surcharge will end once all debt issued for the transit improvement program has been paid and the Metropolitan Council determines by resolution that the revenues from the tax surcharges are no longer needed for operation of the program.

FOR or AGAINST

The information listed in Tenn. Code Ann. § 67-4-3206 (b) and (c) is present on the ballot as required by (f). The plaintiffs have not challenged the word limit requirement. The plaintiffs' specific arguments regarding the ballot requirements are addressed below.

A. Clear and Coherent Language/Placement of Surcharge in Ballot Language

The plaintiffs' argument regarding the surcharge consists of the following:

As to whether the language is [sic] "clear and coherent" manner, the language does not mention the surcharge until the next to the last sentence of the ballot referendum and, thus, the increase in taxes, which is the primary purpose of seeking the voters' approval, is not clear from the ballot language. Additionally, the statute indicates that the "surcharge" be printed first , then the "brief summary." Instead of following the statute, the Mayor buried the revelation of the increase in taxes at the bottom of the referendum language after the summary of the TIP.

The rules for the interpretation of statutes are well-established. A basic rule is to construe a statute to ascertain and give effect to the intention of the legislature as expressed by the statute. *Worrall v. Kroger Co.*, 545 S.W.2d 736, 738 (Tenn. 1977). The "[l]egislative intent or purpose is to be ascertained primarily from the natural and ordinary meaning of

the language used, without forced or subtle construction that would limit or extend the meaning of the language." *Carson Creek Vacation Resorts, Inc. v. State Dep't. of Revenue*, 865 S.W.2d 1, 2 (Tenn.1993). Every word in a statute has meaning and purpose. *In re C.K.G.* 173 S.W.3d 714, 722 (Tenn. 2005).

In a 186-word ballot question, where the surcharge is placed in the ballot language is not as important as what the surcharge language says. The relevant sentence states, "This program will be funded by federal grants, revenues from transportation system fares, debt, and a sales tax surcharge of 0.5%." There is no ambiguity in this sentence. It is clear and direct with no possibility of misunderstanding. Additionally, Tenn. Code Ann. § 67-4-3202(b)(1) mentions the surcharge first, but does not require the surcharge to be placed first in the ballot language.

## B.  Initial Cost

"A transit improvement program must state: (4) An estimate of the initial and recurring cost of the program." Tenn. Code Ann. § 67-4-3206(c)(4). The brief summary on the ballot must also contain this information. Tenn. Code Ann. § 67-4-3206(f). In what the plaintiffs label "the most egregious violation of the statutory requirements," the monetary figure for the initial cost is listed on the ballot as $3,096,000,000. The plaintiffs maintain that the plain meaning of the term "initial" cost is the ten-year cost of the program. Financial feasibility requires, the plaintiffs maintain, that it is the cost of the plan through its life that matters, not the current cost.

The plaintiffs make policy arguments for providing voters with the ten-year cost of the plan. However, we must deal with what the legislature said, not what may or may not be most informative to the voters. The legislature said "initial" cost. It provided no definition or example of the word "initial." Thus, we are left with the natural and ordinary meaning of the word. "Initial" means "of or relating to the beginning." https://www.merriam-webster.com/dictionary/initial (last accessed March 11, 2025). Synonyms include "earliest," "first," "leadoff," and "inaugural." *Id*. Without further instruction from the legislature, we cannot conclude that the word "initial" means ten years down the road.

## C.  Parameters of the IMPROVE Act

What projects does the IMPROVE Act cover, and what projects does it not cover? This is a central question of this litigation. To answer this question, we must go back to the definition of "public transit system":

> any mass transit system intended for shared passenger transport services to the general public, together with any building, structure, appurtenance, utility, transport support facility, transport vehicles, service vehicles, parking

facility, or any other facility, structure, vehicle, or property needed to operate the transportation facility or provide connectivity for the transportation facility to any other non-mass transit system transportation infrastructure, including, but not limited to, interstates, highways, roads, streets, alleys, and sidewalks[.]

Tenn. Code Ann. § 67-4-3201(3). The program of "specified public transit system projects and services" that Metro developed is called a "Transit improvement program" ("TIP"). Tenn. Code Ann. § 67-4-3201(5).

The definition of public transit system determines what is legitimately part of the TIP. Both sides of this litigation focus on the word "connectivity." The plaintiffs view the word narrowly; the defendants view it more broadly. The plaintiffs correctly point out that Tenn. Code Ann. § 67-4-3201(3) lists "interstates, highways, roads, streets, alleys, and sidewalks," in a non-exclusive list of non-mass transit system transportation infrastructure. The plaintiffs would limit the term "connectivity" to the construction of any "facility, structure, vehicle, or property needed to connect a transportation facility to "interstates, highways, roads, streets, alleys, and sidewalks" in the immediate vicinity of the transportation facility. For example, the TIP plans for installation of 86 miles of sidewalks, safety improvements at 35 high-injury intersections and adding or upgrading 35 miles of bike facilities. With little explanation the plaintiffs view these matters as not being authorized by the IMPROVE Act.

The defendants and the trial court take a somewhat broader view. They emphasize that the plan contains mass transit All-Access Corridors. The TIP states on page 41 that:

All-Access Corridors include a high-frequency by line with strategically located dedicated transit-only lanes, ensuring increased service reliability for passengers. These routes have more frequent service times and higher-quality stop/station amenities than standard bus routes. These corridors will include transportation upgrades for pedestrians and cyclists and signal upgrades, including transit signal priority that allows busses to move through intersections quicker than cars and new or upgraded sidewalks within ¼ or ½ mile.

As the chancellor observed, the sidewalks and roads are in the corridors. Along with the improved signals and bike routes, they connect the mass transit system to neighborhoods, apartment buildings, and other concentrations of people.

Nothing in the IMPROVE Act defines connectivity or sets parameters on the location of connected non-mass transit improvements. In light of the discretion given by the act in this area, we find that the proposal approved by the electorate is fully consistent with the IMPROVE Act, with one exception --- the purchase of land for housing

development and parks. We fail to see how the purchase of property for housing development and parks is consistent with Tenn. Code Ann. § 67-4-3201(3). Property purchased with the surcharge must be used for the public transit system as defined in Tenn. Code Ann. § 67-4-3201(3). Yet the purchase of land for housing development and parks is not a purchase for the transit system, nor does it "provide connectivity for the transportation facility to any other non-mass transit system transportation infrastructure, including, but not limited to, interstates, highways, roads, streets, alleys, and sidewalks[.]" Tenn. Code. Ann. § 67-4-3201(3). Such property is a place of origination or destination. Metro's goal is laudable, but the IMPROVE Act does not provide the means. Metro will have to find other funds to accomplish this goal.[2] We reverse the trial court's decision on the purchase of property for housing and parks.

IV.     Whether the plan is Financially Feasible

The financial feasibility of the transit system project must be established by meeting the requirements of Tenn. Code Ann. § 67-4-3206. Metro must:

Prepare a plan of financing that demonstrates a proposed transit improvement program's financial feasibility that includes the methodology and assumptions used in the financial forecasts and projections supporting the plan's analysis. The plan of financing shall include information on the amount of the transit improvement program's infrastructure to be financed through the issuance of bonds or other debt. The plan of financing's analysis will be based on forecasts and projections for at least a ten-year period after the planned inception date for the program. For the purposes of this section, "financial feasibility" means the transit improvement program is likely to be viable after taking into account the anticipated costs, risks, and liabilities of the transit improvement program, the anticipated revenue generated by the surcharge and transit improvement program, and the local government's financial position. A local government shall obtain a determination or

---

[2] We note that the loss of this small part of the plan, approximately 1 percent of the surcharge revenue, will not invalidate the plan. Tennessee Code Annotated section 67-4-3205(c) provides that:

If either a transit improvement program or a public transit system project that is part of a transit improvement program becomes unfeasible, impossible, or not financially viable, the revenue from the surcharge for the transit improvement program may be directed to and utilized for a separate transit improvement program or public transit system project that:

(1) Has been approved by:
    (A) The local government's legislative body, as required in § 67-4-3206(e)(1); and
    (B) A majority of the number of registered voters of the local government voting in an election pursuant to the procedures in § 67-4-3202; and
(2) Otherwise meets the requirements of this part.

opinion in accordance with the attestation standards from an independent certified public accounting firm that the assumptions in the local government's plan of financing provide a reasonable basis for the local government's forecast or projection given the hypothetical assumptions supporting its analysis that the proposed transit improvement program is financially feasible. Prior to obtaining the determination or opinion, the local government shall obtain approval from the comptroller of the treasury of the selection of the firm and the procedures to be used by the firm in making the determination or opinion. Upon approval of the firm and the procedures to be used by the firm by the comptroller of the treasury, the local government shall submit to the firm a plan of financing for any of the projects or services to be provided as part of the transit improvement program. Other relevant information may be considered in making the determination or opinion required by this subdivision (d)(3). The local government shall publish the completed financial feasibility determination or opinion in its entirety with the plan of financing on its website as soon as practicable after completion.

Tenn. Code Ann. §67-4-3206(d)(3). Metro followed these steps. The plaintiffs argue that the financial feasibility requirement has not been met because the plan relies in part on federal funding, and the Kraft firm did not make a specific finding about federal funding.

The procedures for Kraft to use to evaluate the reasonableness and financial feasibility of the TIP were proposed by Metro and Kraft and approved by the Comptroller. Metro's assertions include that the TIP will receive $1.52 billion in federal and state grants and that "All Federal and state grant sources are based on current Metro experiences and recent grant awards made to similar transportation systems." Kraft's procedures to approve the financial feasibility of the TIP include determining "that all federal and grant sources are based on the experience of similar transportation systems. Review supporting documentation . . . related to Bipartisan Infrastructure Law Grants Programs, as well as any other Federal, State, or local grants to determine the reasonableness of the plan estimates." Kraft concluded that,

In our opinion, management's assertions related to the Plan of Finance about the methodology and assumptions used in the financial forecasts and projections supporting its analysis that the proposed transit program is financially feasible, and assertion about the amount of the transit improvement program's infrastructure to be financed through bonds, sales tax surcharges, or other financing methods, provide a reasonable basis for Metro Nashville's Plan of Finance and are presented in accordance with criteria set forth in Sections 67-4-3201 through 67-4-3206, Tennessee Code Annotated, in all material respects.

In our opinion, Kraft found that the TIP's reliance on federal funds is reasonable and financially feasible.

## V. Whether IMPROVE Act requirements were met by the Ordinance

The Chancellor viewed the declaratory judgment claim in the plaintiffs' complaint as a challenge to the validity of the ordinance. Indeed, paragraph 124 of the complaint seeks a "declaratory judgment that Ordinance BL2024-427 is invalid." The defendants claim that the plaintiffs do not have standing and that their claims are not ripe. These are "viable defenses" to a declaratory judgment action. *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 838 (Tenn. 2008). The plaintiffs seek standing as taxpayers.[3] "[T]axpayers suing the government are not required to allege a distinct injury as long as they '(1) allege[] a "specific illegality in the expenditure of public funds" and (2) ha[ve] made a prior demand on the governmental entity asking it to correct the alleged illegality.'" *Case v. Wilmington Trust, N.A.*, 703 S.W.3d 274, 290 n.14 (quoting *Fannon v. City of LaFollette*, 329 S.W.3d418, 427 (Tenn. 2010) (quoting *Cobb v. Shelby Cnty. Bd. of Comm'rs*, 771 S.W.3d 124, 126 (Tenn. 1989)). The plaintiffs have alleged specific illegality in the expenditure of the IMPROVE Act tax funds, but there is nothing in the complaint or the record to show that a demand to correct the alleged illegality was made. Thus, the plaintiffs' fail to have standing under the declaratory judgment act.

Assuming arguendo, that we are wrong on the plaintiffs' standing, we find that the claims are ripe because the taxes are being collected, and the plan is about to be implemented. Therefore, we shall discuss the declaratory judgment claim.

Contrary to the plaintiffs' arguments, an examination of the ordinance shows that it contains all the information required by Tenn. Code Ann. § 67-4-3206 (b) and (c) (quoted in italics):

(b*) A transit improvement program must indicate and describe in reasonable detail the public transit system projects and services to be funded and implemented under the program.*

The TIP addresses many parts of Davidson County. For example, it is replete with maps and accompanying text showing where the plan's sidewalks, traffic signals and street projects will be located (Exhibit 12, Ordinance No. BL2024-427, TIP attached as Exhibit 1, page 26, figure 4); a Frequent Transit Network (Exhibit 12, TIP page 62, figure 12; and other examples.

---

[3] They never say so expressly in the complaint. They never replied to the defendants' standing argument in their reply brief. One can infer their use of taxpayer status by the name of the campaign committee – Committee to Stop an Unfair Tax.

(c) *A transit improvement program must state:*
*(1) The type and rate of a surcharge that will provide funding to the program;*

The TIP has a one-half cent sales tax surcharge (Ordinance, page 2; Exhibit 12, TIP page 88).

*(2) When a surcharge will terminate or the date or conditions upon which the surcharge will be terminated or reduced;*

"The tax surcharge will end once all debt issued for the transit improvement program has been paid and the Metropolitan Council determines by resolution that the revenues from the tax surcharges are no longer needed for operation of the program." (Ordinance, page 2; Exhibit 12, Finance Plan attached to TIP, page 4).

*(3) Any other sources of funding for the program;*

Federal grants from the Federal Infrastructure and Jobs Act, State funds, fares, bond proceeds (Ordinance, page 2; Exhibit 12, TIP page 85 -88, including figure 22 and Finance Plan attached to TIP. Pages 5 and 8).

*(4) An estimate of the initial and recurring cost of the program;*

"This program's capital cost is estimated to have a current cost of $3,096,000,000. Once construction is complete, the estimated value of recurring annual operating and maintenance costs is approximately $111,000,000." (Ordinance, page 2; Finance Plan attached to TIP, pages 7 and 10).

*(5) The implementing agencies responsible for carrying out the program;*

"The Metropolitan Transit Authority (WeGo), Nashville Department of Transportation and Multimodal Infrastructure, Metro Planning Department, and Mayor's Office, in partnership with other Metro departments, will undertake implementation of the program." (Ordinance, page 2).

*(6) The geographic location of the public transit system projects.*

This information is included in the ordinance. (Ordinance, page 2; Exhibit 12, TIP, Map, page 95).

Prior to adopting the TIP, the Metro Council had to meet two more statutory requirements: "(1) Solicit public comment regarding the transit improvement program," and "(2) Make reasonable efforts to notify or coordinate with other local governments surrounding the local government that is considering adopting the transit improvement program." Tenn. Code Ann. § 67-4-3206(d)(1)-(2). Beginning in February of 2024, the people working on the plan began meeting with Metro Council members, residents, and businesses about the plan. Based on the testimony of Michael Briggs, the trial court found,

> Beginning on February 1, 2024, Metro tracked the data regarding these meetings including the type of meeting or session or event, the number of attendees, the meeting organizer, if the Mayor was present, and his staff leads in attendance. (Exh. 11). The data, which includes events occurring February 1 through November 3, 2024, shows: 10,178 touchpoints, 379 meetings/events, 225 sessions (transit talks), 16 bus events, 18 booth events, 11 advisory committee meetings/check ins and 38 distinct Council member listening sessions. (Id.). In addition, Metro operated an informational website that allowed for public questions and comments.

These actions satisfy Tenn. Code Ann. § 67-4-3206(d)(1). Furthermore, the trial court found that,

> Briggs, who was the meeting organizer for many of the sessions Metro tracked, also testified regarding his meetings with other local governments and entities regarding the Plan. Those included the following: the Regional Transportation Authority, which has representatives from Clarksville to Murfreesboro; the Greater Nashville Regional Council, which is a regional transportation planning organization of Nashville and surrounding counties; Williamson, Inc. (the Williamson County chamber of commerce organization); and the WeGo Star Study, involving surrounding communities serviced by the WeGo Star. Briggs also participated in meetings with State of Tennessee representatives including Butch Eley, Deputy Governor and Commissioner of Transportation, and Governor Bill Lee. The Mayor and other city officials also attended those meetings. Briggs also personally worked with Tennessee Department of Transportation engineers regarding state highways that would be impacted by the Plan.

(footnote omitted). These meetings satisfy the requirements of Tenn. Code Ann. § 67-4-3206(d)(2).

## VI. Discovery and the plaintiffs' request for sanctions

On December 21, 2024, the trial court issued an order due to a discovery dispute. The court noted that this action was filed as an election contest, which comes with time

limits. The trial court has 50 days to try the case after the election results are certified. Tenn. Code Ann. § 2-17-106. The time limit necessitates an expedited process. Indeed, "[t]he proceedings in an election contest are said to be summary in nature." *Forbes*, 816 S.W.2d at 718. The court determined that whether the plan qualifies under the IMPROVE Act as a TIP and whether the ballot language complies with the IMPROVE Act are questions of law requiring no discovery or proof. The court further determined that whether Metro complied with the IMPROVE Act to get the initiative on the ballot did require discovery. Thus, the court limited the defendants' production of documents to those "documents establishing Metro's compliance with the steps set out in Tenn. Code Ann. § 67-4-3206(d-f)." The court also allowed the plaintiffs "to take a deposition of a Metro corporate representative or representatives, pursuant to Tenn. R. Civ. Pro. 30.02(6), to testify regarding Metro's compliance with the steps set out in Tenn. Code Ann. § 67-4-3206(d-f)."

On January 6, 2025, the plaintiffs moved for sanctions for failure to comply with the trial court's December 21, 2024 discovery order. The sanction the plaintiffs sought was that the defendants could not contest whether they complied with Tenn. Code Ann. § 67-4-3206(d)-(f). The application of this sanction would mean that the defendants would lose the case. In an order issued on January 13, 2025,[4] the trial court found "that Defendants have complied with the Court's December 21, 2024 Order and fully responded to discovery."

Trial courts have broad discretion over discovery matters and will not be overruled unless there is an abuse of discretion. *Siler v. Scott*, 591 S.W.3d 84, 112 (Tenn. Ct. App. 2019). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). We find none of those errors here.

CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part. Costs of this appeal are assessed against the appellants, Committee to Stop an Unfair Tax and Emily Evans, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

---

[44] While the order was issued on January 13, 2025, the court actually ruled on the motion on January 8, 2025.